UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 17-22422-CV-SEITZ
(14-20221-CR-SEITZ)
MAGISTRATE JUDGE P.A. WHITE

MARIA HAYDEE LUZULA,

    Movant,

v.

UNITED STATES OF AMERICA,

    Respondent.

_____/

**REPORT OF**
**MAGISTRATE JUDGE**

## I. Introduction

The pro se movant, **Maria Haydee Luzula**, has filed this motion to vacate (Cv DE#1) pursuant to 28 U.S.C. §2255, challenging the constitutionality of her convictions and sentences, entered in case no. 14-CR-20221-Seitz.

This Cause has been referred to the Undersigned for consideration and report pursuant to 28 U.S.C. §636(b)(1)(B),(C); S.D.Fla. Local Rule 1(f) governing Magistrate Judges, S.D. Fla. Admin. Order 2003-19; and, Rules 8 and 10 Governing Section 2255 Cases in the United States District Courts.

The Court has reviewed the movant's motion (Cv-DE#1), the government's response (Cv-DE#6) to this court's order to show cause, the movant's reply (Cv-DE#11,12), together with the Pre-Sentence Investigation report ("PSI"), the Statement of Reasons ("SOR"), and all pertinent portions of the underlying criminal file under attack here, including, but not limited to, the factual proffer (Cr DE# 128) and relevant transcripts (Cr DE# 223, 224,

239, 226).[1]

## II. Claims

This court, recognizing that movant is *pro se,* afforded her liberal construction pursuant to Haines v. Kerner, 404 U.S. 419 (1972). As can best be discerned, the movant raises the following grounds for relief:

**Claim 1:** Ineffective assistance of counsel for failing to pursue an "advice of counsel" defense at trial. (Cv DE#1:14-16).

**Claim 2.1:** Ineffective assistance of counsel for failing to conduct an adequate pre-trial investigation regarding government witness Cinthya Guerrero's travel records. (Cv DE#1:17).

**Claim 2.2:** Ineffective assistance of counsel for failing to object to the government's directing Angeluz-Everglades employees to improperly gather evidence or otherwise obtain evidence by a search warrant which was not supported by probable cause. (Cv DE# 1:17).

**Claim 2.3:** Ineffective assistance of counsel for failing to move to sever Petitioner's trial from that of her co-defendant and from entering an informal agreement not to implicate Petitioner's co-defendant at their joint trial. (Cv DE#1:17-18).

**Claim 2.4:** Ineffective assistance of counsel for stipulating to a restitution amount. (Cv DE#1:18).

**Claim 3.1:** The court erred in failing to protect Petitioner in connection with her initial and mid-trial change of plea hearings. (Cv DE# 1:19-23).

**Claim 3.2:** Ineffective assistance of counsel in

---

[1]The undersigned takes judicial notice of its own records as contained on CM/ECF in those proceedings. See Fed.R.Evid. 201.

connection with Petitioner's initial and mid-trial change of plea hearings. (Cv DE# 1:19-23).

**Claim 4:** The government violated her constitutional rights by eliciting false testimony at trial. (Cv DE# 1:24).

**Claim 5:** Ineffective assistance of counsel for failing to object at trial and on appeal to the trial court's improper participation in plea negotiations. (Cv DE# 1:25-27).

### III. <u>Factual and Procedural History</u>

#### A. <u>Factual Proffer</u>

The following facts are taken from the factual basis for the guilty plea document, signed by the Petitioner. (Cr DE# 128).

Between October 2012 and January 2014, Petitioner and her co-defendant son Rodriguez Cuya operated a common enterprise that defrauded and extorted Spanish-speaking individuals residing in the United States. Rodriguez Cuya owned and operated phone rooms in Peru under the business name "Everglades" that contacted victims and induced them to make payments. Petitioner owned and operated a Miami business under the names Angeluz Miami, LLC, and Angeluz Florida Corporation (collectively, "Angeluz") that received and distributed payments and shipped packages to victims across the United States. Petitioner and Rodriguez Cuya regularly communicated about their common enterprise and both directly and indirectly exercised control over the phone rooms in Peru. (Cr DE# 128, Factual Basis for Guilty Plea, ¶1).

Angeluz Miami, LLC was incorporated in the State of Florida on May 8, 2012, with records listing Petitioner as Registered Agent and Manager. (<u>Id.</u>:¶2). Angeluz Florida Corporation was incorporated

3

in the State of Florida on January 20, 2010, with records listing Petitioner as the Director and President. (Id.:¶2). Both entities operated out of Petitioner's office in Miami. (Id.:¶¶2,3).

With Petitioner's knowledge and assistance, Rodriguez Cuya purchased lists containing the contact information for Spanish-speaking residents of the United States, the "victims," who had previously purchased products from unaffiliated companies. (Id.:¶4). Acting directly and indirectly under Petitioner's and Rodriguez Cuya's control, the callers in Peru contacted these victims and falsely claimed that they were calling from a "legal department" of another private entity or, at times, a state or city. (Id.). The Everglades employees told victims that the victims had failed to accept delivery of and pay for products purchased from the unaffiliated companies, without disclosing that Everglades was unaffiliated with such companies. (Id.). The Everglades employees falsely claimed that the unaffiliated companies had incurred substantial costs due to the victims' failure to accept and pay for the purported product delivery. They further claimed that the victims were liable for these alleged costs and fines. (Id.).

Callers controlled by Petitioner and Rodriguez Cuya claimed that the unaffiliated companies were prepared to sue the victims, and establish fines for thousands of dollars, but that the victims could resolve the claims and avoid going to court or facing other consequences by paying "settlement" fees for hundreds of dollars. (Id.:¶5). In fact, there were no such lawsuits or fines, and the victims' payments were sent to and kept by Petitioner and her co-conspirators. (Id.:¶8).

Victims were placed in contact with Angeluz in Miami, where

4

Petitioner and employees under her direction spoke to victims and processed victim payments. At times, Angeluz sent packages purporting to contain products the victims bought and receipts absolving the victims of the threatened lawsuits and fines. Petitioner and her co-conspirators later used shipping records of such packages to defend against victim complaints and payment refund requests. (Id.:¶7).

Victims frequently objected to making payments to Angeluz because, in reality, they had not refused delivery of any products, nor had they ordered additional products as Everglades callers claimed. (Id.:¶6). Everglades callers used by Petitioner and Rodriguez Cuya threatened victims with egregious consequences if the victims failed to pay, including that they could face "preventative detention," confiscation and seizure of property, negative marks on their credit reports, and mandated community service requirements necessitating time off work. (Id.). Some victims were even threatened with deportation or negative immigration consequences if they did not pay Angeluz. (Id.). Many victims made monetary payments out of fear for these threatened consequences. (Id.).

Petitioner knew that the representations made to victims such as those described above were materially false at the time they were made and calculated to induce victims to send money to the Angeluz/Everglades common enterprise. (Id.:¶¶9,13). Such representations furthered the conspiracy initiated and directed by Petitioner and Rodriguez Cuya.

B. Procedural History

On January 10, 2014, a criminal complaint was filed against

5

Petitioner and her co-defendant son, Juan Alejandro Rodriguez Cuya.
(Cr DE# 1).

On May 15, 2014, Petitioner appeared before the District Court
for a change of plea hearing having entered into a plea agreement
with the government. (CR DE# 223). Her defense counsel, Brian
Barakat, informed the court that Petitioner was on medication,
including medication for treating depression, but he had no reason
to believe Petitioner was unable to understand the court
proceedings. (Id.:6). During its plea colloquy, the Court asked
about Petitioner's medications. Petitioner stated that she had
taken a pain pill and an anti-depressant pill that morning. The
Court asked whether these medications in any way affected
Petitioner's ability to participate in the proceeding, to assist
her counsel, or understand the Court's words. (Id.:7). Petitioner
answered, "It's possible," thus rendering the Court unable to
accept her guilty plea at that time. (Id.).

The Court expressed skepticism that the Federal Detention
Center would prescribe medication to patients that made them
uncertain as to their competency to participate in court
proceedings. (Id.). The Court told Petitioner and defense counsel
that it could not accept a guilty plea if Petitioner did not know
whether her medicine affected her competency. (Id.). After a recess
in which Barakat discussed Petitioner's medications with her and
the differences between being nervous and being able to understand,
Barakat relayed a summary of their conversation to the Court,
noting that he believed her comment was a result of her being
nervous. (Id.:9). The Court suggested Petitioner not take her
medication if it affected her capacity. (Id.). As the Court had not
yet received an affirmative indication directly from Petitioner
that Petitioner believed the medications did not affect her ability

to understand questions, the Court asked Barakat to discuss Petitioner's medications with her and her doctors at the Federal Detention Center, and the Court rescheduled the hearing for the next day. (Id.:11).

At the rescheduled hearing on May 16, 2014, Barakat informed the Court that he had again discussed Petitioner's medications and guilty plea with her. He stated that Petitioner shook her head "no" when he asked if she had taken medication that morning, and shook her head "no" when he asked if she still wanted to plead guilty. (Cr DE# 224:2-3). Petitioner apparently understood Barakat and communicated to him that she wished to forego pleading guilty at that time. (Id.).

On June 10, 2014, The government charged Petitioner by superseding indictment with one count of conspiracy to commit mail and wire fraud in violation of 18 U.S.C. §1349 (Count 1); nine counts of mail fraud in violation of 18 U.S.C. §1341 (Counts 2-10); fifteen counts of wire fraud in violation of 18 U.S.C. §1343 (Counts 11-25); and two counts of attempted extortion in violation of 18 U.S.C. §1951(a) (Counts 26-27). (Cr DE# 126).

Petitioner and her son Rodriguez Cuya proceeded to trial on October 6, 2014. After a week of trial, on October 10, 2014, Petitioner changed her plea to guilty as to all the counts against her and consented to the forfeiture of property. (Cr DE# 239, Change of Plea Hearing, p. 80-126). Petitioner was placed under oath. (Id.:82). She next provided background information including her age, education, and professional training. (Id.:82-84).

Petitioner stated that she had been able to satisfactorily communicate with her attorney. (Id.:84). They always used an

7

interpreter. (<u>Id.</u>). She confirmed that she had enough time to consult with her lawyer. (<u>Id.</u>:85). Petitioner affirmed that she was satisfied with the legal representation provided by Mr. Barakat. (<u>Id.</u>:108). Petitioner stated: "He is a very good lawyer, he has conducted himself as a true friend. I respect all of the advice and decisions that he helped me make in my defense." (<u>Id.</u>:109).

The court next addressed her mental competency. Petitioner stated she had not been recently treated for mental illness, drug addiction, or alcohol addiction. (<u>Id.</u>:85). Petitioner explained that she had taken pain killers during the prior twenty-four hour period but that the medication did not interfere with her understanding of the proceedings. (<u>Id.</u>:86). The court asked whether she was taking anti-anxiety medication and she answered no. Defense counsel interjected, noting that he believed she had been prescribed anti-anxiety medication, but did not always take it. Counsel did not think she had taken it that day. (<u>Id.</u>). Petitioner clarified that she had taken 600 milligrams of ibuprofen and that one day earlier, she took her anti-anxiety medication. (<u>Id.</u>:86-87).

The court stated that based on its observation, Petitioner was "articulate and coherent." (<u>Id.</u>:87). However, the court asked defense counsel whether he had confidence in her ability to enter the plea. Defense counsel explained that he previously arranged for a professional to examine Petitioner and he received a report which stated she was coherent. From talking with her that day, he agreed with the report's conclusion. (<u>Id.</u>).

The AUSA and the court next explained the elements of each crime listed in the charging document. (<u>Id.</u>:89-97). Petitioner repeatedly acknowledged that she understood. (<u>Id.</u>).

Petitioner confirmed that the court could rely on the factual proffer as it was true and accurate. (Id.:107). She acknowledged that she signed the last page of the factual proffer. (Id.:102).

Petitioner acknowledged that she discussed and understood the following with counsel: the elements of the charges, the government's evidence, the weaknesses in the government's case, possible defenses, the possible ranges of sentences, and the fact that the court could not yet determine the exact length of her sentence. (Id.:97-98,108). Petitioner confirmed that after her discussions with counsel, she was sure she wanted to plead guilty to the 27 counts in the superseding indictment. She acknowledged that no one had made any promises or threats to persuade her to plead guilty. (Id.:108-09).

Petitioner understood she was giving up her right to be found guilty, beyond a reasonable doubt, by a jury. (Id.:109-10). Petitioner further understood that she had a right to call witnesses, cross-examine the government's witnesses, and make a decision regarding whether to testify. (Id.:110).

Petitioner also said she understood the court could impose a twenty-year sentence for the conspiracy count, a twenty-year sentence for each mail fraud count, a twenty-year sentence for each wire fraud count, and a twenty-year sentence for the two extortion counts. (Id.:115). Petitioner understood that she would not be able to withdraw her guilty plea simply because she did not like the sentence ultimately imposed. (Id.:120). The court also explained the Federal Sentencing Guidelines and Petitioner responded that she understood. (Id.:99-101).

Petitioner acknowledged that because she was a citizen of

9

Peru, she could be subject to deportation once she completed her sentence. (<u>Id.</u>:119).

The court asked if Petitioner was willfully, freely, and voluntarily entering a plea after thoughtfully considering her situation. (<u>Id.</u>:120). Petitioner answered in the affirmative. (<u>Id.</u>). The court then asked Petitioner how she wished to plead to each individual count and Petitioner answered each time, "Guilty." (<u>Id.</u>:120-24).

The court concluded that Petitioner was competent and capable of entering an informed plea, that she understood the charges, as well as her rights and possible penalties. (<u>Id.</u>:125). The court found that the evidence set forth in the factual proffer satisfied all the elements of the crimes charged. The court further found that Petitioner's decision to plead guilty was freely, voluntarily, knowingly, and intelligently made; not the result of force, threats, or promises. The court lastly found that Petitioner had the advice and counsel of a very competent lawyer, with whom Petitioner stated she was satisfied. (<u>Id.</u>). In light of the foregoing, the court accepted Petitioner's guilty plea and adjudicated Petitioner guilty of counts 1 through 27 of the superseding indictment. (<u>Id.</u>).

The trial continued against Rodriguez Cuya, who the jury found guilty on all counts. (Cr DE# 142).

On December 17, 2014, the Court entered a money judgment against Petitioner and Rodriguez Cuya in the amount of $1,739,964.44, the amount defendants agreed represented the proceeds obtained from their Count 1 conspiracy activities. (CR DE# 155:3). Petitioner also agreed to forfeit her residence held in the

name of her corporate alter ego. (Id.).

The PSI separated the offenses in separate groups. Group One, conspiracy to commit mail and wire fraud: The base offense level was set at seven, §2B1.1(2)(1). (PSI ¶25). Because the loss exceeded more than $1,000,000, but was less than $2,500,000, the offense level was increased by 16 levels, §2B1.1(b)(1)(I). (PSI ¶26). Because the offense involved more than 250 victims, the offense level was increased by six levels, §2B1.1(b)(2)C). (PSI ¶27). Because the offense involved the misrepresentation that the defendant was acting on behalf of a government agency, the offense level was increased by two levels, §2B1.1(b)(9)(A). (PSI ¶28). Because a substantial part of the fraudulent scheme was committed from outside the United States and otherwise involved sophisticated means, the offense level was increased by two levels, §2B1.1(b)(10)(B),(C). (PSI ¶29). Because the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, four levels were added, §3B1.1(a). (PSI ¶31). The adjusted offense level (subtotal) for Group One was set at 37. (PSI ¶33).

Group Two, Attempted extortion (Count 26): The base offense level was set at 18, §2B3.2(a). (PSI ¶33). (PSI ¶35). Because the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, four levels were added, §3B1.1(a). (PSI ¶38). The adjusted offense level (subtotal) for Group Two was set at 22. (PSI ¶40).

Group Three, Attempted extortion (Count 27): The base offense level was set at 18, §2B3.2. (PSI ¶41). Because the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, four levels were

11

added, §3B1.1(a). (PSI ¶44). The adjusted offense level (subtotal) for Group Two was set at 22. (PSI ¶46).

The greater of the adjusted offense levels was set at 37. (PSI ¶48). The level was decreased by two levels due to Petitioner's acceptance of responsibility. (PSI ¶52). The total offense level was set at 35. (PSI ¶53).

The petitioner had one criminal history point an a criminal history category of I. (PSI ¶56).

Statutorily, as to Count One, the maximum term of imprisonment was 20 years, 18 U.S.C. §§1341 and 1343; as to each of Counts 2 through 10, the maximum term of imprisonment was 20 years, 18 U.S.C. §1341; as to each of Counts 11 through 25, the maximum term of imprisonment was 20 years, 18 U.S.C. §1343; and as to each of Counts 26 through 27, the maximum term of imprisonment is 20 years, 18 U.S.C. §1951(a). (PSI ¶104). Based upon a total offense level of 35 and a criminal history category of I, the guideline imprisonment range was 168 months to 210 months. (PSI ¶105).

At sentencing, defense counsel objected to the enhancements for fraud loss amount and Petitioner's role in the offense, and requested a downward departure based on her claimed childhood trauma. (Cr DE# 149). Among other evidence, the Court reviewed a psychiatrist's report on Petitioner that defense counsel and Petitioner's son Christian Rodriguez had arranged. (Cr DE# 226, Sentencing Hearing, at 42). The Court overruled Petitioner's objections as to fraud loss amount and role. (Id.:7, 17). In applying the factors set forth in 18 U.S.C. §3553(a), the Court stated:

> This is an extraordinarily organized and patterned effort
> of fraud over the course of a long period of time and had
> as its mechanism coercion that went to the heart of
> targeting those individuals newly arrived, unfamiliar
> with our system here, who could be subjected to parting
> with their money because of the fear that was induced
> that they would be deported and there would be a
> significant fine that they could not pay. The Court is
> also reflecting on the fact that the evidence at trial
> showed that the defendant was very knowledgeable that it
> was illegal and she could go to jail.

(Id.:41). Nevertheless, the Court varied Petitioner's sentence down one level due to its concern about her alleged past abuse and because it was sympathetic that Petitioner had come close to a more timely acceptance of responsibility in appearing at the May 2014 plea hearings. (Id.:42). The Court sentenced Petitioner to 165 months in prison. (Cr DE# 158,159). Movant prosecuted a direct appeal.

On appeal, movant challenged the amount of loss sentencing enhancement and her leadership role sentencing enhancement. United States v. Luzula, 646 Fed.Appx. 903, 904 (11th Cir. 2016).

On **April 1, 2016**, the Eleventh Circuit Court of Appeals affirmed the judgment of conviction in a written, unpublished opinion. Luzula, 646 Fed.Appx. 903. Petitioner did not seek review in the Supreme Court. Thus, the movant's judgment of conviction became final on **Tuesday, July 5, 2016**, when the 90-day period in which to file a timely petitioner of certiorari expired.[2] The

---

[2]The Supreme Court has stated that a conviction is final when a judgment of conviction has been rendered, the availability of appeal exhausted, and the time for a petition for certiorari elapsed, or a petition for certiorari finally denied. Griffith v. Kentucky, 479 U.S. 314, 321, n.6 (1986); accord, United States v. Kaufman, 282 F.3d 1336 (11th Cir. 2002); Wainwright v. Sec'y Dep't of Corr's, 537 F.3d 1282, 1283 (11th Cir. 2007)(conviction final under AEDPA the day U.S. Supreme Court denies certiorari, and thus limitations period begins running the next day). Once a judgment is entered by a United States court of appeals, a petition for writ of certiorari must be filed within

13

movant had one year from the time her judgment became final, or no later than **Wednesday, July 5, 2017,** within which to timely file this federal habeas petition. Applying the anniversary method[3] to this case means movant's limitations period expired on **July 5, 2017.**

The movant returned to this court, timely filing the instant motion to vacate, with supporting memorandum, on **June 28, 2017.**[4] (Cv-DE#1). The court issued an order to show cause to the government (Cv DE# 5), which filed a response. (Cv DE# 6). Petitioner filed a reply and an amended reply to the government's response. (Cv DE# 11, 12).

## IV. <u>Threshold Issues-Timeliness</u>

The government rightfully does not challenge the timeliness of the movant's §2255 motion to vacate, as the motion was filed on **June 28, 2017** before the expiration of the one-year limitation

---

90 days of the date of entry. The 90 day time period runs from the date of entry of the judgment rather than the issuance of a mandate.  <u>Sup.Ct.R.</u> 13; <u>see also</u>, <u>Close v. United States</u>, 336 F.3d 1283 (11th Cir. 2003).

    [3]<u>See</u> <u>Downs v. McNeil</u>, 520 F.3d 1311, 1318 (11 Cir. 2008)(<u>citing</u> <u>Ferreira v. Sec'y, Dep't of Corr's</u>, 494 F.3d 1286, 1289 n.1 (11 Cir. 2007)(this court has suggested that the limitations period should be calculated according to the anniversary of the date it began to run); <u>accord</u> <u>United States v. Hurst</u>, 322 F.3d 1256, 1260-61 (10 Cir. 2003); <u>United States v. Marcello</u>, 212 F.3d 1005, 1008-09 (7 Cir. 2000)); <u>see also</u> 28 U.S.C. §2255.

    [4]"Under the prison mailbox rule, a *pro se* prisoner's court filing is deemed filed on the date it is delivered to prison authorities for mailing." <u>Williams v. McNeil</u>, 557 F.3d 1287, 1290 n.2 (11th Cir. 2009); <u>see</u> <u>Fed.R.App.</u> 4(c)(1)("If an inmate confined in an institution files a notice of appeal in either a civil or a criminal case, the notice is timely if it is deposited in the institution's internal mail system on or before the last day for filing."). Unless there is evidence to the contrary, like prison logs or other records, a prisoner's motion is deemed delivered to prison authorities on the day he signed it. <u>See</u> <u>Washington v. United States</u>, 243 F.3d 1299, 1301 (11th Cir. 2001); <u>Adams v. United States</u>, 173 F.3d 1339 (11th Cir. 1999) (prisoner's pleading is deemed filed when executed and delivered to prison authorities for mailing).

period on **July 5, 2017.**

## V. <u>General Legal Principles</u>

Because collateral review is not a substitute for direct
appeal, the grounds for collateral attack on final judgments
pursuant to §2255 are extremely limited. A prisoner is entitled to
relief under §2255 if the court imposed a sentence that
(1) violated the Constitution or laws of the United States,
(2) exceeded its jurisdiction, (3) exceeded the maximum authorized
by law, or (4) is otherwise subject to collateral attack. <u>See</u> 28
U.S.C. §2255(a); <u>McKay v. United States</u>, 657 F.3d 1190, 1194 n.8
(11th Cir. 2011). "Relief under 28 U.S.C. §2255 'is reserved for
transgressions of constitutional rights and for that narrow compass
of other injury that could not have been raised in direct appeal
and would, if condoned, result in a complete miscarriage of
justice.'" <u>Lynn v. United States</u>, 365 F.3d 1225, 1232 (11th Cir.
2004)(citations omitted). The "fundamental miscarriage of justice"
exception recognized in <u>Murray v. Carrier</u>, 477 U.S. 478, 496
(1986), provides that it must be shown that the alleged
constitutional violation "has probably resulted in the conviction
of one who is actually innocent ...."

The movant raises multiple claims challenging counsel's
effectiveness during all stages of the proceeding. The Sixth
Amendment to the United States Constitution guarantees criminal
defendants the right to the assistance of counsel during criminal
proceedings against them. <u>Strickland v. Washington</u>, 466 U.S. 668,
684-85, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). When assessing
counsel's performance under <u>Strickland</u>, the Court employs a strong
presumption that counsel "rendered adequate assistance and made all
significant decisions in the exercise of reasonable professional

15

judgment." Id. at 690. "[T]he Sixth Amendment does not guarantee the right to perfect counsel; it promises only the right to effective assistance ...." Burt v. Titlow, ___ U.S. ___, 134 S.Ct. 10, 18, 187 L.Ed.2d 348 (2013). To prevail on a claim of ineffective assistance of counsel, the movant must demonstrate (1) that the movant's counsel's performance was deficient, i.e., the performance fell below an objective standard of reasonableness, and (2) that the movant suffered prejudice as a result of that deficient performance. Strickland, 466 U.S. at 687-88.

To establish deficient performance, the movant must show that, in light of all the circumstances, counsel's performance was outside the wide range of professional competence. Strickland, supra. See also Cummings v. Sec'y for Dep't of Corr's, 588 F.3d 1331, 1356 (11th Cir. 2009)("To establish deficient performance, a defendant must show that his counsel's representation fell below an objective standard of reasonableness in light of prevailing professional norms at the time the representation took place.")(internal quotation marks omitted). The Court's review of counsel's performance should focus on "not what is possible or what is prudent or appropriate but only [on] what is constitutionally compelled." Chandler v. United States, 218 F.3d 1305, 1313 (11th Cir. 2000)(en banc), cert. den'd, 531 U.S. 1204 (2001)(quoting Burger v. Kemp, 483 U.S. 776, 107 S.Ct. 3114, 3126, 97 L.Ed.2d 638 (1987)). There are no absolute rules dictating what is reasonable performance because absolute rules would restrict the wide latitude counsel have in making tactical decisions. Id. at 1317. The test for ineffectiveness is not whether counsel could have done more; perfection is not required. Nor is the test whether the best criminal defense attorneys might have done more. Chandler, 218 F.3d at 1313. Instead, the test is whether what counsel did was within the wide range of reasonable professional assistance. Id. at 1313

16

n.12.

Regarding the prejudice component, the Supreme Court has explained "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. In assessing whether a particular counsel's performance was constitutionally deficient, courts indulge a strong presumption that counsel's conduct falls within the wide range of reasonable assistance. Strickland, 466 U.S. at 689. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. A court need not address both prongs of Strickland if the defendant makes an insufficient showing on one of the prongs. Stickland, 466 U.S. at 697. See also Brown v. United States, 720 F.3d 1316, 1326 (11 Cir. 2013); Butcher v. United States, 368 F.3d 1290, 1293 (11 Cir. 2004). Further, counsel is not ineffective for failing to raise non-meritorious issues. Chandler v. Moore, 240 F.3d 907, 917 (11 Cir. 2001). Moreover, counsel is not required to present every non-frivolous argument. Dell v. United States, 710 F.3d 1267, 1282 (11 Cir. 2013).

A court must adhere to a strong presumption that "counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689. Strategic choices made after thorough investigation of the law and facts relevant to plausible options are virtually unchallengeable. Id. at 690-91. To uphold a lawyer's strategy, the Court need not attempt to divine the lawyer's mental processes underlying the strategy. "There are countless ways to provide effective assistance in any given case." Strickland, 466 U.S. at 689. No lawyer can be expected to have considered all of the ways. Chandler, 218 F.3d at 1316.

17

Furthermore, a §2255 movant must provide factual support for her contentions regarding counsel's performance. Smith v. White, 815 F.2d 1401, 1406-07 (11th Cir.1987). Bare, conclusory allegations of ineffective assistance are insufficient to satisfy the Strickland test. See Boyd v. Comm'r, Ala. Dep't of Corr's, 697 F.3d 1320, 1333-34 (11th Cir. 2012); Garcia v. United States, 456 Fed.Appx. 804, 807 (11th Cir. 2012) (citing Yeck v. Goodwin, 985 F.2d 538, 542 (11th Cir. 1993)); Wilson v. United States, 962 F.2d 996, 998 (11th Cir. 1992); Tejada v. Dugger, 941 F.2d 1551, 1559 (11th Cir. 1991); Stano v. Dugger, 901 F.2d 898, 899 (11th Cir. 1990)(citing Blackledge v. Allison, 431 U.S. 63, 74, 97 S.Ct. 1621, 52 L.Ed.2d 136 (1977)); United States v. Ross, 147 F. App'x 936, 939 (11th Cir. 2005).

Finally, the Eleventh Circuit has recognized that the test is not what the best lawyers would have done or even what most good lawyers would have done, but rather whether some reasonable lawyer could have acted in the circumstances as defense counsel acted. Williamson v. Moore, 221 F.3d 1177, 1180 (11th Cir. 2000). "Even if counsel's decision appears to have been unwise in retrospect, the decision will be held to have been ineffective assistance only if it was 'so patently unreasonable that no competent attorney would have chosen it.'" Dingle, 480 F.3d at 1099 (quoting Adams v. Wainwright, 709 F.2d 1443, 1445 (11th Cir. 1983)). The Sixth Circuit has framed the question as not whether counsel was inadequate, but was counsel's performance was so manifestly ineffective that "defeat was snatched from the hands of probable victory." United States v. Morrow, 977 F.2d 222, 229 (6th Cir. 1992).

As will be demonstrated in more detail below, the movant is

18

not entitled to vacatur on the claims presented.[5] When viewing the evidence in this case in its entirety, the alleged errors raised in this collateral proceeding, neither individually nor cumulatively, infused the proceedings with unfairness as to deny the movant a fundamentally trial and due process of law. The movant therefore is not entitled to habeas corpus relief. See Fuller v. Roe, 182 F.3d 699, 704 (9th Cir. 1999)(holding in federal habeas corpus proceeding that where there is no single constitutional error existing, nothing can accumulate to the level of a constitutional violation), overruled on other grounds, Slack v. McDaniel, 529 U.S. 473, 482 (2000). See also United States v. Rivera, 900 F.2d 1462, 1470 (10th Cir. 1990)(stating that "a cumulative-error analysis aggregates only actual errors to determine their cumulative effect."). Contrary to the movant's apparent assertions, the result of the proceedings were not fundamentally unfair or unreliable. See Lockhart v. Fretwell, 506 U.S. 364, 369-70 (1993).

## VI.   Discussion

Under **claim 1**, Petitioner alleges ineffective assistance of counsel for failing to pursue an "advice of counsel" defense at trial. (Cv DE#1:14-16). Petitioner asserts that she was told by her legal advisers at Angeluz, Cesar Ponce and Robert Pittman, that she was in compliance with all applicable law. She claims her defense counsel was a friend of Mr. Ponce and Mr. Pittman and, therefore,

---

[5]Briefly, the evidence against the movant was more than sufficient to support her conviction. The movant has not shown that the result of the trial or appeal would have been affected had counsel proceeded differently. Further, no denial of due process has been demonstrated. To the contrary, it is clear after independent review of the record that the movant received a fair trial, and that no constitutional violations occurred. Even if constitutional violations did occur, it did not rise to the level that it would warrant the grant of a new trial. Consequently, she has failed to demonstrate that she is entitled to relief in this collateral proceeding.

failed to pursue this defense based on a conflict of interest. Specifically, defense counsel's desire to make sure the government did not indict his friends. (Id.).

In general, a good faith reliance on advice of counsel defense is only viable if the defendant shows that, before acting "(1) he fully disclosed to his attorney all material facts that are relevant to the advice for which he consulted the attorney; and (2) thereafter, he relied in good faith on advice given by his attorney." United States v. Hill, 643 F.3d 807, 851 (11th Cir.2011).

Petitioner only provides conclusory claims that she continued to engage in the scheme, which involved falsely telling people that they owed money to her company, because she relied in "good faith" on Ponce and Pittman. This is insufficient to warrant relief. Counsel clearly made a strategic decision not to present this defense, because it did not have any evidentiary support. See (Cv DE# 6-1). Defense counsel's choice to not call Pittman or Ponce at trial in arguing an advice of counsel defense was a well-grounded "strategic decision" not "so patently unreasonable that no competent attorney would have chosen it." See Adams v. Wainwright, 709 F.2d 1443, 1445 (11th Cir. 1983). Strategic decisions regarding whether to raise a specific defense are "virtually unchallengeable" under Strickland. As will be discussed below, Petitioner stated under oath at her change of plea hearing that she understood and was willingly giving up her right to raise a defense at trial, which included an "advice of counsel" defense.

Under **claim 2.1**, Petitioner alleges ineffective assistance of counsel for failing to conduct an adequate pre-trial investigation regarding government witness Cinthya Guerrero's travel records. (Cv

20

DE#1:17).

As a preliminary matter, Guerrero testified after Petitioner entered a guilty plea. In so doing, Petitioner stated under oath she understood that she was giving up her right to cross-examine the government's witnesses. Her current claim is at odds with her prior sworn testimony.

Furthermore, Petitioner's argument is refuted by the record. At trial, Guerrero testified that she traveled to Peru from time to time to visit family and friends, and that she met with Rodriguez Cuya and visited his office in Peru. (Cr DE# 246:45). Guerrero testified that she visited Rodriguez Cuya in Peru in 2012. (Id.). Petitioner now argues that had counsel examined Guerrero's travel records or interviewed her, counsel would have learned her testimony was false. (Cv DE# 1:17).

Petitioner attaches Guerrero's Peruvian travel records and a transcript of a phone call between Guerrero and Rodriguez Cuya's wife recorded in July 2016—long after the trial and sentencing. Petitioner attached a document which appears to illustrate that Guerrero entered and exited various countries from February 2002 through March 2008. (Cv DE# 1-1:55). This document is not relevant to Guerrero's testimony that she went to Peru in 2012. There is no indication that this document is a complete record of Guerrero's travel. With respect to the telephone call transcript, counsel is not ineffective for failing to discover a statement not yet made by a government witness.

Even assuming Guerrero's testimony regarding her travel to Peru was false, Petitioner cannot show how admitting this testimony into evidence undermined the government's extensive evidence

21

regarding the criminal scheme conducted by Petitioner and her son.
The substance of Guerrero's testimony that Petitioner challenges
here relates to whether Guerrero observed Rodriguez Cuya overseeing
the operation's call center in Lima, Peru. See (Cr DE# 248:7-8).
That information was corroborated and unchallenged at trial, and
moreover would have little to no bearing on Petitioner's guilt even
if she had proceeded to stand trial long enough to cross-examine
Guerrero. Thus, even if it were assumed that this testimony was
incorrect, this claim falls short of the standard of showing
ineffective assistance. See, e.g., Streeter v. United States, 335
F. App'x 859, 862 (11th Cir. 2009) (defendant convicted of uttering
fictitious instruments was not denied effective assistance of
counsel due to trial counsel's failure to obtain and use as
impeachment evidence attendance records from her school, even if
records rebutted co-conspirators' testimony that she was with them
at the time they cashed counterfeit checks, where "overwhelming
record support" existed for verdict); Adams v. Balkcom, 688 F.2d
734, 743 (11th Cir. 1982) (holding that petitioner was not denied
effective assistance in part because other evidence corroborated
allegedly impeachable witness's testimony and that "any weight
which the jury would have attributed to any prior inconsistent
statement would have been negligible").

In light of the foregoing, Petitioner is not entitled to
relief under claim 2.1.

Under **claim 2.2**, Petitioner alleges ineffective assistance of
counsel for failing to object to the government's directing
Angeluz-Everglades employees to improperly gather evidence or
otherwise obtain evidence by a search warrant which was not
supported by probable cause. (Cv DE# 1:17). Petitioner argues that
the government directed Pia Silva and Cinthya Guerrero to steal

22

"emails, CRM (Customer Relations Management) System, and voice recordings" in order to obtain search warrants and prosecute the Petitioner. (Id.).

Petitioner only provides conclusory allegations, without any evidentiary support. Her claims are refuted by the record. The government obtained the records about which Petitioner complains pursuant to legally valid search warrants based on probable cause in October of 2013. See Case no. 13-mj-3496-AMS (Microsoft warrant for Rodriguez Cuya email); Case no. 13-mj-3497-AMS (Google warrant for Luzula and Silva email addresses); Case no. 13-mj-3495-AMS (IPBX warrant for recordings and CRM records).

Petitioner fails to establish that defense counsel's performance fell below an objective standard of reasonableness or that but for defense counsel's failures, the outcome would have been different. See Strickland, 466 U.S. at 687-88, 693-94. Petitioner's conclusory claims do not warrant relief on this ground.

Under **claim 2.3,** Petitioner alleges ineffective assistance of counsel for failing to move to sever Petitioner's trial from that of her co-defendant and from entering an informal agreement not to implicate Petitioner's co-defendant at their joint trial. (Cv DE#1:17-18). In other words, counsel should have arranged that Petitioner be tried alone and put forth a defense that her son was solely responsible for the entire operation.

Petitioner's claim that counsel entered an informal agreement with her co-defendant to avoid implicating him in the crime is refuted by the record. Defense counsel highlighted the different roles the defendants played and attempted to portray Petitioner as

23

the less culpable of the two. During the pretrial detention hearing defense counsel established that certain fraudulent calls originated in Peru from the company owned by co-defendant Rodriguez Cuya. (Cr DE# 111:18). At trial, defense counsel stated that "all of the calls come from Peru" and were "not coming from Miami." (Cr DE# 250:44). Defense counsel also pointed the finger at Rodriguez Cuya in connection with Petitioner's sentencing. In objections to the PSI, defense counsel described in detail co-defendant Rodriguez Cuya's role in the scheme and stated "Defendant Juan Alejandro Rodriguez Cuya was the leader of the fraud." (Cr DE# 149:2-3). At Petitioner's sentencing hearing, defense counsel argued that Luzula deserved a three-level leadership enhancement, rather than a four-level enhancement, because co-defendant Rodriguez Cuya "set[] the bar" while Petitioner "tr[ied] to pull away from it." (Cr DE# 226:13). Defense counsel clearly implicated Petitioner's co-defendant in the crimes throughout the proceedings. As a result, Petitioner's argument is refuted by the record.

Furthermore, Petitioner has failed to establish that counsel was ineffective in failing to file motion to sever. A district court may sever the trial of co-defendants whenever it appears that a defendant would be prejudiced by his joint trial with a co-defendant. See Fed.R.Cr.P.14.[6] "Nevertheless, because of the well-settled principle that it is preferred that persons who are

---

[6]The Rule states, in relevant part:

> If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.

Fed.R.Cr.P. 14.

charged together should also be tried together, particularly in conspiracy cases, the denial of a motion for severance will be reversed only for abuse of discretion." United States v. Smith, 918 F.2d 1551, 1559 (11th Cir. 1990)(quotation and citation omitted); see also Zafiro v. United States, 506 U.S. 534, 537 (1993)(noting "a preference in the federal system for joint trials of defendants who are indicted together"); see also, e.g., United States v. Baker, 432 F.3d 1189, 1236 (11th Cir. 2005); United States v. Cassano, 132 F.3d 646, 651 (11th Cir. 1998).

The principle behind the foregoing rule is that joint trials, where appropriate, promote judicial economy. See United States v. Meester, 762 F.2d 867, 883 (11th Cir. 1985); see also United States v. Lopez, 649 F.3d 1222, 1233 (11th Cir. 2011) (recognizing that joint trials play a "vital role in the criminal justice system" as they reduce the risk of inconsistent verdicts, lighten the burden on victims and witnesses, increase efficiency, and conserve scarce judicial resources). Therefore, a Rule 14 motion to sever must balance the prejudice a defendant may suffer from a joint trial against the public interest in judicial economy and efficiency. See United States v. Zaldivar, No. 2:06-CR-50FTM, 2006 WL 2884099, at *2 (M.D.Fla. Oct. 9, 2006) (citing United States v. Lehder-Rivas, 955 F.2d 1510, 1521 (11th Cir. 1992)).

A severance may be granted only if a defendant can demonstrate that a joint trial will result in "specific and compelling prejudice" to his or her defense. United States v. Eyster, 948 F.2d 1196, 1214 (11th Cir. 1991). "Compelling prejudice" requires a defendant to establish that a joint trial "would actually prejudice the defendant and that a severance is the only proper remedy for that prejudice jury instructions or some other remedy short of severance will not work." Lopez, 649 F.3d at 1234; United States v.

<u>Schlei</u>, 122 F.3d 944, 984 (11th Cir. 1997)(quotation and citation omitted). The defendant bears the "heavy burden" to show that a jury will be unable, due to the complex nature of the evidence, to make an individualized determination of guilt for each defendant. <u>United States v. Francis</u>, 131 F.3d 1452, 1459 (11th Cir. 1997). Bare and conclusory allegations of spillover prejudice will not satisfy this heavy burden. <u>Id</u>. In other words, the "potential for prejudice from a joint trial is not enough." <u>Lopez</u>, 649 F.3d at 1234 (determining that defendants charged with drug-trafficking had not established compelling prejudice due to joinder with co-defendants charged for capital murder).

Here, Petitioner has not overcome her heavy burden by showing that a joint-trial with her co-conspirator was prejudicial to her. The factual proffer established that each defendant played a different and separate role in the criminal scheme. Under the totality of the circumstances present here, the movant cannot establish either deficient performance or prejudice under <u>Strickland</u> due to counsel's failure to file such a motion. Petitioner is entitled to no relief on this claim.

The conclusion that defense counsel's failure to move to sever did not result in prejudice is further bolstered by the fact that Petitioner's co-defendant did in fact move to sever the trial, without success. (Cr DE# 90:3). The Court denied Rodriguez Cuya's motion to sever. (Cr DE# 256:5). There was no risk that a joint trial of these co-conspirators would compromise a specific trial right of Petitioner or Rodriguez Cuya or prevent the jury from making a reliable judgment. <u>See Zafiro v. United States</u>, 506 U.S. 534 (1993). Petitioner cannot credibly claim that she was prejudiced by her attorney's failure to raise a futile severance argument when her co-defendant made the same argument in a motion

to sever, which the Court rejected.

Under **claim 2.4**, Petitioner alleges ineffective assistance of counsel for stipulating to a restitution amount. (Cv DE#1:18). Petitioner appears to argue that her counsel's stipulation to $700,000 in restitution made it harder for counsel to obtain a ruling in Petitioner's favor when objecting to the loss amount at sentencing.

The law is well settled that "the proper amount of restitution is the amount wrongfully taken by the defendant." United States v. Hemphill, 694 Fed.Appx. at 699-700 (quoting United States v. Huff, 609 F.3d 1240, 1249 (11th Cir. 2010) (quotation omitted and alteration adopted). It is not intended to be a "windfall" to victims, but instead to make victims "whole for their losses." Id. (quotation omitted). Defense counsel stipulated to an approximate $700,000 figure after Petitioner's restitution hearing. (Cr DE# 212). This amount was based on verified victims of Petitioner's specific crimes who responded to the government's outreach and for whom the government was able to confirm current contact information and that they had not been made whole through charge-backs or refunds. (Id.).

The fact that defense counsel stipulated to the restitution amount had no bearing on the loss amount determined at sentencing. Restitution is based on actual loss that identifiable victims sustained while loss is determined under §2B1.1(b)(1) using "the greater of actual loss or intended loss." See United States v. Singletary, 649 F.3d 1212, 1220 (11th Cir. 2011) (internal citations omitted).

In objections to the PSI (Cr DE# 149) and at sentencing (Cr

DE# 226), defense counsel vigorously contested the fraud loss amount by arguing that while Petitioner's companies received $1.7 million after charge-backs, legitimate sales drove the fraud loss amount down below $1 million.  The district court rejected these arguments at sentencing and the Eleventh Circuit affirmed on appeal. United States v. Luzula, 646 F. App'x 903, 905 (11th Cir. 2016).

Specifically, the Eleventh Circuit concluded on this issue:

The district court did not clearly err in calculating the amount of loss attributable to Luzula. A defendant is subject to a 16-level increase of her base offense level when her offense results in an actual or intended loss between $1 and $2 million, United States Sentencing Guidelines Manual § 2B1.1(b)(1)(H) & cmt. n.3(A) (Nov. 2014), and the government provided reliable and specific evidence that Luzula's fraud caused a loss within that range, United States v. Bradley, 644 F.3d 1213, 1290 (11th Cir.2011).

Id. The Eleventh Circuit also outlined the overwhelming evidence in support of the loss amount as follows:

Luke Shoemaker, a paralegal with the Department of Justice, provided a declaration that 88 to 94 percent of the victims "paid money in response to threatening calls." Shoemaker screened recordings of the calls, and he identified 162,000 telephone calls from the Peru office involving conversations lasting at least one minute and a smaller subset of calls in which the victims were threatened. Shoemaker used a random number formula to select 63 of the 8,477 victims who paid the Miami office, excluded six victims who did not pay between October 2012 and January 2014 or whose conversation he could not locate, and listened to the corresponding calls to verify that 53 of the remaining 56 victims paid under threat of incurring penalties or a lawsuit. Luzula argues that Shoemaker should have taken a larger sample from all the recordings, but any calls not resulting in payments

28

> were irrelevant to calculating the percentage of
> payments. Luzula also argues that the computation was
> "sloppy and erroneous," but she fails to establish that
> Shoemaker's estimate was "so wildly inaccurate as to be
> unreasonable," [Bradley, 644 F.3d] at 1292. Luzula
> contends that a significant percentage of the calls
> involved legitimate sales, but the district court was
> entitled to rely on trial testimony from Luzula's former
> assistant, Pia Silva, that, in December 2012, the Peru
> office operated exclusively as a fraudulent collections
> agency and, in 2013, the Miami office processed payments
> only for fraudulent transactions.

Id. The Eleventh Circuit concluded that the "district court made a reasonable, conservative estimate that Luzula obtained 88 percent of her net proceeds, or about $1.5 million, through fraud and intimidation." Id. (citing See United States v. Barrington, 648 F.3d 1178, 1197 (11th Cir.2011)).

Petitioner cannot establish that but for counsel's stipulation to the restitution amount, the loss amount determined at sentencing, and affirmed on appeal, would have been lower. She, therefore, cannot establish prejudice under Strickland.

Under **claim 3.1**, Petitioner alleges that the court erred in failing to protect Petitioner in connection with her initial and mid-trial change of plea hearings. (Cv DE# 1:19-23).

The Petitioner's argument is one which was not raised on appeal, but could have been. As a result, the argument is procedurally defaulted from review. It is well settled that a claim is procedurally barred if a movant fails to raise it on appeal. In that regard, there are three types of issues that a section 2255 motion cannot raise: (1) issues that were raised on direct appeal, absent a showing of changed circumstances; (2) nonconstitutional issues that could have been but were not raised on direct appeal;

29

and (3) constitutional issues that were not raised on direct appeal, unless the section 2255 petitioner demonstrates cause for the procedural default as well as actual prejudice from failure to appeal. <u>Belford v. United States</u>, 975 F.2d 310 (7th Cir. 1992), <u>overruled on other grounds by</u> <u>Castellanos v. United States</u>, 26 F.3d 717 (7th Cir. 1994). In order to overcome the bar, the movant must show cause for the default and actual prejudice, <u>Wainwright v. Sykes</u>, 433 U.S. 72 (1977), or a fundamental miscarriage of justice, <u>Engle v. Isaac</u>, 456 U.S. 107 (1982). No such showing has been made here. As a result, Petitioner is not entitled to review on the merits of this ground.

Under **claim 3.2**, Petitioner alleges ineffective assistance of counsel in connection with Petitioner's initial and mid-trial change of plea hearings. (Cv DE# 1:19-23). Petitioner argues that counsel should have informed the court that she was not competent to enter a guilty plea.

The Due Process Clause of the Fourteenth Amendment prohibits states from trying or convicting a defendant who is mentally incompetent. <u>See</u> <u>Pate v. Robinson</u>, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966). The Supreme Court set the standard to be used in determining mental competency as whether a defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding-and whether he has a rational as well as factual understanding of the proceedings against him." <u>Dusky v. United States</u>, 362 U.S. 402, 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960) (*per curiam*); <u>Drope v. Missouri</u>, 420 U.S. 162, 171, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975); *see also* <u>Indiana v. Edwards</u>, 554 U.S. 164, 128 S.Ct. 2379, 171 L.Ed.2d 345 (2008).

In <u>Drope</u>, the Court elaborated as follows:

30

> [t]he import of our decision in Pate v.
> Robinson is that evidence of a defendant's
> irrational behavior, his demeanor at trial,
> and any prior medical opinion on competence to
> stand trial are all relevant in determining
> whether further inquiry is required, but that
> even one of these factors standing alone may,
> in some circumstances, be sufficient. There
> are, of course, no fixed or immutable signs
> which invariably indicate the need for further
> inquiry to determine fitness to proceed; the
> question is often a difficult one in which a
> wide range of manifestations and subtle
> nuances are implicated. That they are
> difficult to evaluate is suggested by the
> varying opinions trained psychiatrists can
> entertain on the same facts.

Drope, 420 U.S. at 180.

In applying these standards, the Eleventh Circuit Court of
Appeals has noted that "[N]either low intelligence, mental
deficiency, nor bizarre, volatile, and irrational behavior can be
equated with mental incompetence to stand trial." Medina v.
Singletary, 59 F.3d 1095, 1107 (11th Cir. 1995) (citation omitted).
A Pate analysis must focus on "what the trial court did in light of
what it then knew, [and] whether objective facts known to the trial
court were sufficient to raise a bona fide doubt as to the
defendant's competency." Fallada v. Dugger, 819 F.2d 1564, 1568
(11th Cir. 1987)(citations omitted).

Independent review of the record as a whole reveals no
evidence that the movant was suffering from any possible mental
health disorders which affected her ability to understand the
nature of the proceedings, to participate in her own defense prior
to trial, at the change of plea, or at sentencing.

31

Defense counsel arranged for Petitioner to be examined by a mental health professional after the aborted change of plea hearing in May 2014. See (Cr DE# 239, Change of Plea Hearing, p. 86-89). The report issued concluded that Petitioner was competent. (Id.). The court and defense counsel both concluded during the mid-trial change of plea hearing that Petitioner gave no signs that she was not coherent or mentally competent to understand the proceedings. (Id.).

Under these circumstances, no showing has been made in this collateral proceeding that counsel was ineffective for failing to raise a competency defense prior to or at the change of plea proceeding. The test for determining a defendant's competency to stand trial is "whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding--and whether he has a rational as well as factual understanding of the proceedings against him." Dusky v. United States, 362 U.S. 402 (1960). The mere presence of mental illness or other mental disability at the time of trial does not necessarily mean that a defendant is incompetent under the Dusky test. The mental illness or disability must have been so debilitating that the defendant was unable to consult with his lawyer and did not have a rational and factual understanding of the proceedings. See generally Bolius v. Wainwright, 597 F.2d 986, 990 (5 Cir. 1979). No such showing has been made here.

Petitioner cannot establish deficiency, much less prejudice under Strickland arising from counsel's failure to pursue this nonmeritorious issue.

Under **claim 4**, Petitioner alleges that the government violated her constitutional rights by eliciting false testimony at trial.

32

(Cv DE# 1:24). Petitioner claims that the AUSA elicited false testimony from government witnesses Cinthya Guerrero,[7] Fernando Moio, and Pia Silva at trial. Petitioner alleges that Guerrero's and Moio's testimony regarding travel dates to Peru is contradicted by travel records. Petitioner claims Silva provided false testimony by stating that she left Angeluz in December 2013, when her last paycheck was dated in January 2014.

If movant means to suggest that her conviction and sentence should be vacated based on prosecutorial misconduct, this "'is an extreme sanction which should be infrequently utilized.'" United States v. Accetturo, 858 F.2d 679, 681 (11th Cir. 1988)(quoting United States v. Pabian, 704 F.2d 1533, 1536 (11th Cir. 1983)). The movant has not demonstrated here that the government witnesses, as alleged, testified falsely, much less that the government suborned perjury. It is well settled that the standard for federal habeas corpus review of a claim of prosecutorial misconduct is whether the alleged actions rendered the entire trial fundamentally unfair. Donnelly v. DeChristoforo, 416 U.S. 637, 642-45 (1974); Hall v. Wainwright, 733 F.2d 766, 733 (11 Cir. 1984). In assessing whether the fundamental fairness of the trial has been compromised, the totality of the circumstances are to be considered in the context of the entire trial, Hance v. Zant, 696 F.2d 940 (11 Cir.), cert. denied, 463 U.S. 1210 (1983); and, "[s]uch a determination depends on whether there is a reason-able probability that, in the absence of the improper remarks, the outcome of the trial would have been different." Williams v. Weldon, 826 F.2d 1018, 1023 (11 Cir.), cert. denied, 485 U.S. 964 (1988). No such showing has been made here.

---

[7]Above the Undersigned rejected Petitioner's argument that Guerrero provided false testimony.

Regardless, the record is devoid of any objective evidence that the government suborned any fraudulent testimony, as maintained by the movant. In order to prevail on a Giglio claim, the movant must establish that the prosecutor knowingly used perjured testimony, or failed to correct what he or she subsequently learned was false testimony, and that the falsehood was material. United States v. Vallejo, 297 F.3d 1154, 1163-64 (11th Cir. 2002); Tompkins v. Moore, 193 F.3d 1327, 1339 (11th Cir. 1999)(quoting, United States v. Alzate, 47 F.3d 1103, 1110 (11th Cir. 1995)). Under Giglio, "the falsehood is deemed to be material 'if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.'" Id. (quoting, United States v. Agurs, 427 U.S. 97, 103 (1976)). The government is also required to turn over to a criminal defendant any impeachment evidence that is likely to cast doubt on the reliability of a witness whose testimony may be determinative of guilt or innocence. United States v. Jordan, 316 F.3d 1215, 1226 n.16, 1253 (11th Cir. 2003).

Even assuming the alleged discrepancies in Moio's, Guerrero's, and Silva's testimony existed, they would be immaterial to Petitioner's case and the witnesses' credibility. Importantly, Petitioner does not offer any assertions of falsity regarding their material testimony as to her ownership, control, and knowing participation in the scheme to defraud.

After Petitioner pleaded guilty, Guerrero testified regarding Petitioner's and Rodriguez Cuya's partnership in running the scheme (Cr DE# 246:44), the co-defendants' modus operandi of lying to victims in order to obtain payments (Id.:48, 60, 67), and Petitioner's ability to listen to the operation's call recordings containing baseless lies and threats (Id.:50). Such unchallenged

34

material testimony was well-corroborated by other witnesses' testimony, e-mails, documentary evidence, and phone recordings.

Moio testified that he personally went to Peru and his "engineers went several other times." (Cr DE# 239:68). It is possible his engineers visited Peru on his behalf during certain time frames, and regardless, any potential error in his travel date testimony would have no impact on his testimony explaining the CRM system and phone services he provided to the Angeluz-Everglades operation, his recognition of Petitioner's voice, and/or any other relevant, material evidence. Moio's testimony was corroborated by documentary and other evidence.

Silva, who worked closely with Petitioner in Miami, testified about many material aspects of the fraudulent Angeluz-Everglades operation and Petitioner's role in the operation. Silva's unchallenged testimony on such points is well-supported by other evidence and testimony. Whether Silva left the company before the holidays in late December 2013 or after the holidays in early January 2014 is irrelevant to Silva's credibility and Petitioner's guilt. Any "weight which the jury would have attributed" to these alleged prior inconsistent statements "would have been negligible." Adams v. Balkcom, 688 F.2d 734, 743 (11th Cir. 1982); see also United States v. Kovic, 830 F.2d 680, 684-85 (7th Cir. 1987) (mail fraud and extortion defendant was not denied due process due to "inconsequential inaccurate statements" in his presentence report). In light of the foregoing, Petitioner is not entitled to relief on this ground.

Under **claim 5**, Petitioner alleges ineffective assistance of counsel for failing to object at trial and on appeal to the trial court's improper participation in plea negotiations. (Cv DE#

35

1:25-27).

Petitioner provides no evidence that the court participated in the plea negotiations. However, she relies on a few comments made by the district court during the May 2014 change of plea proceeding.

After Petitioner gave her evasive answer as to whether medications affected her ability to understand the decision to plead guilty, the court told defense counsel to either "find a way to redress that, or the easiest solution is that everybody goes to trial." (Cr DE# 223:10). The court went on to explain that it could not accept a guilty plea if the defendant herself could not say whether she was impaired, and that Petitioner's "It's possible" answer was not enough for the court to properly continue the plea colloquy. (Id.:11). The court cannot force someone to plead guilty, and did not force Petitioner to do so. Furthermore, the court asked defense counsel to speak to Petitioner's doctors and let the Court know if it should reschedule the change of plea hearing. (Id.). The Court rescheduled the change of plea hearing for the following day to give defense counsel an opportunity to investigate Petitioner's competency. Petitioner fails to put forth any argument to support a finding that the court's statements violated her constitutional rights at the May 2014 hearing. Counsel was not ineffective for failing to raise this non-meritorious issue. Chandler v. Moore, 240 F.3d 907, 917 (11 Cir. 2001).

## Change of Plea Hearing

Although the Undersigned addressed each individual issue above, many of the issues raised by Petitioner are arguably foreclosed by her change of plea hearing.

36

The purpose of a §2255 motion is "to safeguard a person's freedom from detention in violation of constitutional guarantees," but "[m]ore often than not a prisoner has everything to gain and nothing to lose from filing a collateral attack upon his guilty plea." See Winthrop-Redin v. United States, 767 F.3d 1210, 1216 (11 Cir. 2014)(quoting Blackledge v. Allison, 431 U.S. 63, 71, 97 S.Ct. 1621, 52 L.Ed.2d 136 (1977)). The Supreme Court has thus instructed that "the representations of the defendant, his lawyer, and the prosecutor at [a plea] hearing, as well as any findings made by the judge accepting the plea, constitute a formidable barrier in any subsequent collateral proceedings." Blackledge v. Allison, 431 U.S. at 73–74, 80 n.19, 97 S.Ct. at 1621-1622, 1630 n.19 (explaining that if the record reflects the procedures of plea negotiation and includes a verbatim transcript of the plea colloquy, a petitioner challenging his plea will be entitled to an evidentiary hearing "only in the most extraordinary circumstances").

It is also well settled that a knowing and voluntary guilty plea waives all non-jurisdictional errors, including non-jurisdictional defects and defenses. United States v. Brown, 752 F.3d 1344, 1347 (11 Cir. 2014). It also bears mentioning that "as a matter of public policy, no court should tolerate claims of this kind, wherein the movant literally suggests in his §2255 filings that he lied during the Rule 11 hearing," "nor should such a movant find succor in claiming" as movant appears to suggest here generally, that "my lawyer told me to lie" or that she was otherwise threatened, coerced, or unlawfully induced by counsel, the government, or the court into doing so. See Gaddis v. United States, 2009 WL 1269234, *5 (S.D.Ga.2009) (unpublished).

"[S]uch casual lying enables double-waivered, guilty-plea convicts to feel far too comfortable filing otherwise doomed §2255

motions that consume public resources." <u>See</u> <u>Irick v. United States</u>,
2009 WL 2992562 at *2 (S.D. Ga. Sept. 17, 2009). Given the thorough
Rule 11 colloquy that was conducted by the court, as narrated
previously in this Report, there is nothing of record to suggest
that the movant's plea was anything other than knowing and
voluntary.

The law is now well settled that a criminal defendant is
entitled to the effective assistance of competent counsel before
deciding whether to plead guilty. <u>Lee v. United States</u>,[8] ___ U.S.
___, 137 S.Ct. 1958, 1964, 198 L.Ed.2d 476 (2017);  <u>see also</u>,
<u>Padilla v. Kentucky</u>, 559 U.S. 356, 357, 130 S.Ct. 1473, 1480-81,
176 L.Ed.2d 284 (2010); <u>Lloyd v. McNeil</u>, 2009 WL 2424576 (S.D. Fla.
2009) (defendant has the right to competent advice regarding the
choice to accept a plea or go to trial).

As narrated previously in this Report, in response to the
court's inquiry during the change of plea proceeding, the movant
**affirmed, under oath,** that she was pleading guilty to all the
charges. (Cr DE# 239, Change of Plea Hearing, p. 120-24). She also
confirmed understanding the nature of the charges, and agreed with
the factual proffer she executed. (<u>Id.</u>:89-97,107). During the Rule
11 change of plea proceedings, the movant affirmed, under oath,
that she was satisfied with his counsel's performance. (<u>Id.</u>:84-
85,108-09). She made no mention of being frustrated with counsel's
failure to investigate the case, failure to file various pre-trial

---

[8]In <u>Lee</u>, the Supreme Court concluded that the movant's claim he would not
have accepted a plea offer was backed by substantial and uncontroverted evidence,
showing that but for counsel's errors, he would not have pleaded guilty and would
have insisted on going to trial. <u>Lee</u>, <u>supra</u> at 1969. That case, however, is
factually distinguishable because there the movant had no strong connections to
any other country, and the consequences of proceeding to trial were not markedly
harsher than pleading. <u>Id.</u> at 1968-69. Here, however, had the movant gone to
trial and was found guilty, she would have faced a significantly harsher sentence
than that which was imposed.

motions, and/or failure to fully advise her of the consequences of
entering a plea. She acknowledged that she understood the
consequences of her plea, after the court described same in detail.


Her representations here, which contradict and/or are
irreconcilable with her sworn statements at the change of plea
hearing, borders on the perjurious, are disingenuous, incredible,
and rejected by this court. To suggest to this court, **under penalty
of perjury**, that she did not understand the consequences of her
plea or that her counsel failed to investigate is to suggest to
this court that the sworn representations she made to the court
during the Rule 11 proceedings were false representations or
material lies, thereby subjecting the movant to future perjury
charges. Thus, movant's allegations here are clearly refuted by the
record, which includes a stipulated factual proffer made under
oath.


Consequently, the movant cannot establish deficient
performance or prejudice arising from counsel's failure to pursue
these nonmeritorious arguments either at the trial court or
appellate level. See Strickland v. Washington, 466 U.S. 668 (1984);
Matire v. Wainwright, 811 F.2d 1430, 1435 (11 Cir. 1987). She has
not shown that counsel was deficient or that she has suffered
prejudice arising from counsel's purported failures. To the extent
she faults counsel for failing to conduct additional pre-plea
investigations, by entering into a knowing and voluntary plea, the
movant was instructing counsel that no further investigation was
warranted. Here, movant has not demonstrated either prong of
Strickland arising from any of the frivolous arguments throughout
the petition. Relief must therefore be denied.

Finally, it is noted that this court has considered all of the movant's grounds for relief. See Dupree v. Warden, 715 F.3d 1295 (11th Cir. 2013)(citing Clisby v. Jones, 960 F.2d 925 (11th Cir. 1992)). For all of her claims, petitioner has failed to demonstrate that she is entitled to the relief requested. In other words, she has failed to satisfy Strickland's deficient performance and/or prejudice prong. Thus, to the extent a precise argument, subsumed within any of the foregoing grounds for relief, was not specifically addressed herein, the claim was considered and found to be devoid of merit, warranting no specific discussion herein.[9]

## VII. **Evidentiary Hearing**

Movant is also not entitled to an evidentiary hearing on the remaining claims raised in this proceeding. Movant has the burden of establishing the need for an evidentiary hearing, and he/she would only be entitled to a hearing if his/her allegations, if proved, would establish his/her right to collateral relief. See Schriro v. Landrigan, 550 U.S. 465, 473-75, 127 S.Ct. 1933, 1939-40, 127 S.Ct. 1933 (2007)(holding that if record refutes the factual allegations in the petition or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing). See also Townsend v. Sain, 372 U.S. 293, 307 (1963); Holmes v. United States, 876 F.2d 1545, 1553 (11th Cir. 1989)

---

[9]To the extent the movant attempts to raise new facts and new arguments in objections to this Report, it should be rejected by this court. As previously noted, "the district court may [and should] exercise its discretion and decline to consider the argument" or new facts. Daniel v. Chase Bank USA, N.A., 650 F.Supp.2d 1275, 1278 (N.D. Ga. 2009)(citing Williams v. McNeil, 557 F.3d 1287 (11th Cir. 2009); see also, Starks v. United States, 2010 WL 4192875 at *3 (S.D. Fla. 2010); United States v. Cadieux, 324 F.Supp.2d 168 (D.Me. 2004). "Parties must take before the magistrate, 'not only their best shot but all of the shots.'" Borden v. Sec'y of Health & Human Servs., 836 F.2d 4, 6 (1st Cir. 1987)(quoting Singh v. Superintending Sch. Comm., 593 F.Supp. 1315, 1318 (D.Me. 1984)).

(citing Guerra v. United States, 588 F.2d 519, 520-21 (5th Cir. 1979))(holding that §2255 does not require that the district court hold an evidentiary hearing every time a section 2255 petitioner simply asserts a claim of ineffective assistance of counsel, and stating: "A hearing is not required on patently frivolous claims or those which are based upon unsupported generalizations. Nor is a hearing required where the petitioner's allegations are affirmatively contradicted by the record.").

## VIII. Certificate of Appealability

A prisoner seeking to appeal a district court's final order denying his/her petition for writ of habeas corpus has no absolute entitlement to appeal, but must obtain a certificate of appealability ("COA"). See 28 U.S.C. §2253(c)(1); Harbison v. Bell, 556 U.S. 180, 129 S.Ct. 1481 (2009). This Court should issue a certificate of appealability only if the petitioner makes "a substantial showing of the denial of a constitutional right." See 28 U.S.C. §2253(c)(2). Where a district court has rejected a petitioner's constitutional claims on the merits, the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. See Slack v. McDaniel, 529 U.S. 473, 484 (2000). However, when the district court has rejected a claim on procedural grounds, the petitioner must show that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." Id. Upon consideration of the record as a whole, this Court should deny a certificate of appealability. Notwithstanding, if petitioner does not agree, he/she may bring this argument to the attention of the district judge in objections.

## IX.   Conclusion

For all of the foregoing reasons, is therefore recommended that this motion be DENIED on the merits; that no certificate of appealability issue; and, that the case be closed.

Objections to this report may be filed with the Chief Judge within fourteen days of receipt of a copy of the report.

SIGNED this 29th day of November, 2018.

_____
UNITED STATES MAGISTRATE JUDGE

cc:  Maria Haydee Luzula, Pro Se
     Reg. No. 02083-104
     Miami FDC
     Federal Detention Center
     Inmate Mail/Parcels
     Post Office Box 019120
     Miami, FL 33101

     Philip M. Toomajian
     United States Department of Justice
     450 5th Street, NW
     Washington, DC 20001
     Email: Philip.Toomajian@usdoj.gov